UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SEAN HENDERSON, | |
| Plaintiff, | No. 19 C 06380 |
| v. | Judge Thomas M. Durkin |
| Chicago Police Officer ALBERT RANGEL, Star No. 5339; Chicago Police Officer ADRIAN ROSILES, Star No. 19462; and the CITY OF CHICAGO, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Sean Henderson alleges that several officers of the Chicago Police Department ("CPD") violated his constitutional rights when they arrested and detained him without probable cause and in reliance on fabricated evidence. Defendants have now moved for summary judgment. For the reasons set forth below, the Court grants Defendants' motion.

**Background**

The following facts are undisputed except where otherwise indicated. Around 10:00 p.m. on March 10, 2017, CPD Officers Albert Rangel and Adrian Rosiles conducted a traffic stop on a vehicle because the front passenger was not wearing a seatbelt. R. 80 ¶ 13. The stopped car was being driven by Henderson. R. 80 ¶¶ 10, 12. The car belonged to Henderson's friend Deonte Johnson, who was riding in the front passenger seat. R. 80 ¶¶ 10, 17. The traffic stop was captured on the body-worn cameras ("BWC") of both officers. R. 80 ¶ 14.

1

After exiting their patrol car, Rangel approached the driver-side door of the stopped vehicle, while Rosiles walked to the passenger-side door. R. 80 ¶ 15. Officer Rangel spoke to Henderson through his partially rolled-down window and asked why Johnson was not wearing a seatbelt. R. 80 ¶ 16. Both officers also smelled burnt cannabis and observed a partially burnt cigar on Johnson's lap. R. 80 ¶ 19.

Rangel asked Henderson to exit the vehicle, but Henderson instead rolled up the tinted window of the car. R. 80 ¶ 20. Rangel claims that he then observed Henderson lean forward in his seat and reach toward the floor. R. 80 ¶ 21. Henderson denies that he reached to the floor and testified that any forward lean was to turn off his car or hang up his phone. R. 80 ¶¶ 21, 22; R. 73-2 108:18-110:9. Rangel then drew his weapon and shouted at Henderson, "don't be reaching" and "get your hands up." R. 80 ¶ 23. Rangel ordered Henderson to open the driver-side door, but Henderson refused and requested that Rangel call for a police sergeant to come to the scene. R. 80 ¶¶ 24-25. Once the sergeant arrived, he approached the driver-side window, remarked that it "reeks of weed," and told Henderson to exit the car. R. 80 ¶ 26. Henderson continued to protest but eventually he and Johnson got out. R. 80 ¶ 27.

After Henderson exited the car, Rangel approached the driver's seat area with the door still open. R. 80 ¶ 28. A flashlight is visible in Rangel's right hand from the 8:13 mark of his BWC video to the 8:18 mark. R. 80 ¶ 29. At about the 8:20 mark in the video, Rangel leans into the driver's seat area. R. 80 ¶ 28. From 8:20 to 8:21, the video shows Rangel's left hand grabbing a badge hanging from a chain around his neck. R. 80 ¶ 29.

2

According to Rangel, he observed a handgun under the driver's seat when he leaned into the car—Henderson disputes that any gun was present before Rangel leaned into the car. R. 80 ¶ 28. The video's audio records Rangel announcing a code to indicate he found a firearm within a few seconds of leaning into the car. R. 80 ¶ 30. The video then shows Rangel pulling a silver handgun from the area under the seat, removing a loaded magazine and a live round from the chamber, and placing the gun on the driver's seat. R. 80 ¶¶ 33-34. The serial number of the handgun had been scratched off. R. 80 ¶ 42. At the time he retrieved the gun, Rangel was wearing winter gloves. R. 84 ¶ 4. As he stepped away from the stopped car, the video partially captured him placing the gun in his cargo pants. R. 84 ¶ 5. Meanwhile, Rosiles recovered the cannabis cigar from Johnson's lap and conducted a protective pat down on him. R. 80 ¶ 36. The officers arrested Henderson and Johnson and transported them to the 6th District police station for processing. R. 80 ¶ 37. Rangel recalled that he kept his gloves on during the stop and while he was transporting the arrestees and the gun to the police station. R. 80 ¶ 7. The handgun and ammunition were eventually placed in sealed envelopes with unique inventory numbers and sent to the CPD crime laboratory for testing and analysis. R. 80 ¶ 41.

At the station, Johnson was interviewed first and told the officers the gun was not his and that he knew nothing about it. R. 80 ¶ 39. Henderson declined to answer questions when interviewed. R. 80 ¶ 40. Rangel confirmed that Henderson did not have a firearm owner's identification car or a concealed carry license. R. 80 ¶ 43. Rangel also confirmed that Henderson had at least two prior felony convictions. R. 80

¶ 44. Rangel then prepared a case incident report that summarized the events of the traffic stop and arrests. R. 80 ¶ 45. The report identified Henderson as the possessor of the recovered firearm. *Id.*

Rangel contacted the felony review unit of the Cook County State's Attorney's Office to assess whether felony charges were appropriate. R. 80 ¶ 46. Assistant State's Attorney Conniff was assigned to the case and prepared a "fact sheet" memorializing the information provided by Rangel. R. 80 ¶ 48. Conniff approved charging Henderson with being an armed habitual criminal, and a grand jury returned a multi-count indictment against him, including various weapons charges. R. 80 ¶ 51.

Henderson remained in Cook County jail throughout the pendency of his criminal case. R. 80 ¶ 54. Rangel says that at some point during the trial, an assistant state's attorney told him that his fingerprints had been found on the handgun. R. 84 ¶ 16. During Henderson's trial, Rangel testified that he handled the gun at the station without his gloves on. R. 80 ¶ 9. On cross-examination, he admitted that he did not actually remember doing so, but said that he "must have." R. 80 ¶ 10. Rangel's case incident report did not mention anything about him removing his gloves or handling the gun at the police station, and he did not write a supplemental report to document having done so. R. 84 ¶¶ 11-12. A jury ultimately acquitted Henderson. R. 80 ¶ 55.

## Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than

4

a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 2021 WL 4486445, at *1 (7th Cir. Oct. 1, 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Analysis

The Fourth Amendment bars unreasonable seizures, such as those "based solely on false evidence, rather than supported by probable cause." *Manuel v. City of Joliet*, 137 S. Ct. 911, 917 (2017). Claims such as the one Henderson raises here, for deprivation of liberty via an arrest and detention supported by fabricated evidence, are cognizable under the Fourth Amendment and 42 U.S.C. § 1983. *See id.*; *see also Thompson v. Clark*, 142 S. Ct. 1332, 1337 (2022) (recognizing a claim under the Fourth Amendment for illegal seizure without probable cause).

"Probable cause does not require certainty." *Hart v. Mannina*, 798 F.3d 578, 587 (7th Cir. 2015). "It is a fluid concept that relies on the common-sense judgment of the officers based on the totality of the circumstances." *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). "Probable cause exists where the police officer is aware

5

of facts and circumstances 'sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense.'" *Coleman v. City of Peoria*, 925 F.3d 336, 350 (7th Cir. 2019) (quoting *Beck v. Ohio*, 379 U.S. 89, 91 (1964)).

When challenged in a civil case, an officer's probable cause determination is entitled to an additional layer of deference via qualified immunity. To be entitled to qualified immunity, "an officer needs only 'arguable' probable cause." *Huff v. Reichert*, 744 F.3d 999, 1007 (7th Cir. 2014) (quoting *Humphrey v. Staszak*, 148 F.3d 719, 725 (7th Cir. 1998)); *see also Hunter v. Bryant*, 502 U.S. 224 (1991) (explaining that qualified immunity protects officers who make reasonable errors in judgment about whether probable cause exists). In this manner, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Tebbens v. Mushol*, 692 F.3d 807, 821 (7th Cir. 2012) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

The crux of the case is the allegation that Defendants fabricated evidence, which would of course defeat a finding of probable cause. *See Patrick v. City of Chicago*, 974 F.3d 824, 834 (7th Cir. 2020). At the motion to dismiss stage, Henderson accused Rangel and Rosiles of lying about observing a "furtive gesture" by Henderson toward the vehicle's floor. In Henderson's briefing on the instant motion, the focus has largely shifted to his allegation that Rangel planted the gun he retrieved from the floor of the car. Although Henderson testified that he did not see Rangel stash the gun under the driver's seat, he argues that the BWC video shows Henderson had the "opportunity" to do so, and that Rangel's fingerprints could only have wound up

6

on the gun if he had handled it before the stop. Neither accusation holds up against the undisputed evidence in this case.

As noted above, the Court ordinarily views disputed facts in the light most favorable to the non-moving party, in this case Henderson. However, when an event in question is captured in video footage of unquestioned authenticity, the court "may consider that video footage without favoring the nonmovant." *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018) (citing *Scott v. Harris*, 550 U.S. 372, 378-81 (2007)). The Court therefore credits the BWC videos that captured Henderson's arrest as undisputed evidence, and to the extent Henderson's (or another party's) account of events differs from what the video depicts, the video controls. *See Williams v. Brooks*, 809 F.3d 936, 942 (7th Cir. 2016) (crediting police dashboard camera video on appeal of summary judgment grant and rejecting argument that ambiguity in video created a factual dispute for the jury to resolve).

Addressing first the question of Henderson's supposed "furtive movement," the BWC video supports Defendants' position. Setting aside whether it conclusively depicts Henderson reaching to the floor, the video confirms that Henderson was shifting in his chair and reaching around the area of his seat. Indeed, he admitted as much, and the video shows tension on his seatbelt consistent with leaning forward. It is irrelevant that the video never captures an image of Henderson holding a gun— as discussed below, the officers did not need to see the gun in Henderson's hand to have probable cause to believe he illegally possessed it.

7

The video likewise undercuts Henderson's claim that Rangel planted a gun beneath his seat. By Henderson's own characterization, the video depicts Rangel leaning into the car for only a few seconds before he pulls the gun out from beneath the driver's seat. For most of that time, Rangel's hands are otherwise occupied, holding a flashlight or grabbing the badge hanging from his neck. True, for two seconds, from 8:22 to 8:23 in the video, Rangel's left hand is out of frame, allegedly leaving him free to plant a gun. However, unless Rangel boasts the prestidigitation (a.k.a. sleight-of-hand) skill of a trained stage magician, Henderson's theory is simply beyond reasonable belief. It supposes that Rangel had concealed on his person a second gun bearing an obliterated serial number before approaching the car at all. He then had to retrieve the second gun and stash it under Henderson's seat without being caught on his or his partner's BWCs or seen by any of the other people on the scene of the arrest, including Henderson himself (who was still standing near the car at the time). And he had a window of no more than two seconds to do this. Furthermore, Henderson's theory calls for conjecture about what is *not* shown in the video. But "no evidence is no evidence," *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 986 (7th Cir. 2020), and any conclusion derived from the video would not be a reasonable inference—it would be pure speculation. *See McCoy*, 341 F.3d at 604.

The evidence that Rangel's fingerprints were found on the gun is insufficient to create a genuine issue of material fact. Rangel's testimony on cross-examination during Henderson's criminal trial adequately explains the presence of his fingerprints on the gun despite not touching it with his bare hands during the traffic

8

stop. The alternative theory, that Rangel secretly handled the gun before planting it, again relies on speculation from an absence of evidence. *See King*, 954 F.3d at 986; *McCoy*, 341 F.3d at 604. And as discussed, the video makes it unreasonable to conclude that Rangel planted the gun. He simply didn't have the time or opportunity to do it.

With the fabrication question resolved, the Court finds Defendants had at least arguable probable cause to arrest and detain Henderson on suspicion of unlawful possession of a firearm. The possession element can be satisfied by actual or constructive possession. *See United States v. Garrett*, 903 F.2d 1105, 1110 (7th Cir. 1990); *People v. Rangel*, 516 N.E.2d 936, 942 (Ill. App. Ct. 1987). Constructive possession can be shown through evidence of a "defendant's knowledge of the presence of the prohibited weapon and his immediate and exclusive control over the area where it was found." *Rangel*, 516 N.E.2d at 942; *accord Garrett*, 903 F.2d at 1110 ("Constructive possession exists when a person does not have actual possession but instead knowingly has the power and the intention at a given time to exercise dominion and control over an object." (quoting *United States v. Taylor*, 728 F.2d 864, 868 (7th Cir. 1984))).

In *Young v. City of Chicago*, 987 F.3d 641, the court had no difficulty finding probable cause on similar facts. As the court explained,

> Describing this case decides the outcome, to wit: Chicago police officers lawfully stopped Young while he was driving. A gun was found next to Young in the car. And Young is a convicted felon. That's textbook probable cause. It does not matter that Young said the gun wasn't his—protesting innocence is not a get-out-of-pretrial-detention-free card.

9

*Id.* at 642. Likewise, in *Jackson*, the court concluded that officers had probable cause to arrest a suspect after observing "furtive movements" and discovering a firearm in the area where he had been seated. *People v. Jackson*, 2017 WL 4274082, at *4 (Ill. App. Ct. Sept. 22, 2017). Outside the probable cause context, other courts have also found constructive possession in cases where a gun was found in a car near the place where a person was sitting. *See, e.g.*, *United States v. Morris*, 576 F.3d 661, 670 (7th Cir. 2009) (finding sufficient evidence that defendant constructively possessed firearm found in door storage compartment of car he was driving).

Here, Rangel found the loaded handgun with an obliterated serial number underneath the seat where Henderson was sitting. He had seen Henderson reaching around in the area of his seat before exiting the vehicle. And there is no dispute that Henderson had a criminal history that ostensibly made it unlawful for him to possess a firearm. If this scenario differs from what the *Young* court called "textbook probable cause," the difference is only slight. Even if the officers knew Henderson was not the owner of the car (and nothing in the record suggests they were aware of this fact at the time of the arrest), that does not preclude a finding of probable cause that he was in possession of the gun under his seat. *See Garrett*, 903 F.2d at 1112 n.8 ("[O]wnership of the property in which contraband is found is not essential to a finding of possession of the contraband."). And while the Seventh Circuit has held that mere proximity to a gun is insufficient to establish constructive possession, *see United States v. Chairez*, 33 F.3d 823, 825 (7th Cir. 1994), in this case the gun was easily within Henderson's "dominion and control." Had the gun been found in the

10

back seat outside Henderson's reach, or the trunk of the car, the calculus may be different, but those are not the facts of this case.

The facts available to Rangel and Rosiles at the time were likely sufficient to establish probable cause under the Fourth Amendment. But even short of that, their determination was undoubtedly reasonable, such that both are entitled to qualified immunity. Indeed, courts have granted qualified immunity on weaker facts than these. *See, e.g.*, *Taylor v. Hughes*, 26 F.4th 419, 432-34 (7th Cir. 2022) (granting qualified immunity to officers who arrested individual after finding a gun in an open safe in another room in the house where he was living).

## Conclusion

For the foregoing reasons, the Court grants Defendants' motion for summary judgment as to all claims. Civil case terminated.

                                       ENTERED:

                                       *Thomas M. Durkin*

                                       Honorable Thomas M. Durkin
                                       United States District Judge

Dated: August 26, 2022